**STEVEN D. OLSON**, OSB No. 00341(Lead Attorney)
   Direct Dial:  (503) 802-2159
   Facsimile:  (503) 972-3859
   Email:  steveno@tonkon.com
**AVA L. SCHOEN**, OSB No. 04407
   Direct Dial:  (503) 802-2143
   Facsimile:  (503) 972-3843
   Email:  avas@tonkon.com
**TONKON TORP** LLP
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR  97204

     Attorneys for Plaintiff Mulu Derbew


## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **MULU DERBEW**, | Civil No. 06-1702 HU |
| **PLAINTIFF**, | |
| v. | **FIRST AMENDED COMPLAINT** |
| **PETER KURIAN, JULIE GILBERT, and KENNETH GILBERT** | **(Violation of the Alien Tort Claims Act, Breach of Contract, Promissory Estoppel, Quantum Meruit, Fraud, Violation of the Fair Labor Standards Act, Intentional Infliction of Emotional Distress, Breach of Fiduciary Duty, Conversion, Breach of Contract)** |
| **DEFENDANTS.** | |
| | **DEMAND FOR JURY TRIAL** |

Plaintiff alleges:

## <u>INTRODUCTION</u>

1.

Human trafficking involves victims who are forced, defrauded, or coerced into

labor exploitation.  Trafficking in human beings, which is reaching epidemic proportions

throughout the world, has found a home in Oregon.  President Bush has called human trafficking a special kind of evil in the abuse and exploitation of the most innocent and vulnerable, and Congress, recognizing the countless human tragedies such practices inflict, passed the Trafficking Victims Protection Act ("TVPA") in 2000.  The TVPA created "T Visas," which allow victims of severe forms of trafficking in persons to remain in the United States and assist federal authorities in the investigation and prosecution of human trafficking cases.  This action is brought under the Alien Tort Claims Act and other federal and state laws to seek just compensation for a victim of human trafficking.

<u>**THE PARTIES**</u>

2.

Plaintiff Mulu Derbew ("Ms. Derbew") is a citizen of Ethiopia.  Over the course of nearly seven years, Ms. Derbew resided in one or more of Defendants' homes in Marion County, Oregon and Clark County, Washington.  Following her escape from Defendants' custody or control, Ms. Derbew obtained a T Visa, which permits her to lawfully remain in the United States.  She resides in Multnomah County, Oregon.

3.

Defendant Peter Kurian ("Defendant Kurian") is a resident of Clark County, Washington.  For several years during the relevant time period, Defendant Kurian was a resident of Marion County, Oregon.  Defendant Kurian employed Ms. Derbew as a domestic worker and childcare worker.

4.

Defendant Julie Gilbert ("Defendant J. Gilbert") is a resident of Marion County, Oregon.  Defendant J. Gilbert was previously married to Defendant Kurian.  At that time, she used the name Julie Kurian.  Defendant J. Gilbert employed Ms. Derbew as a domestic worker and childcare worker.  Defendants Kurian and J. Gilbert are collectively referred to as "the Kurians."

Page 2 -    FIRST AMENDED COMPLAINT

5.

Defendant Kenneth Gilbert ("Defendant K. Gilbert") is a resident of Marion County, Oregon.  Defendant K. Gilbert and Defendant J. Gilbert are married to one another. Defendant K. Gilbert employed Ms. Derbew as a domestic worker and childcare worker.

6.

Defendants Kurian, J. Gilbert and K. Gilbert are referred to collectively as "Defendants."

**<u>JURISDICTION AND VENUE</u>**

7.

Jurisdiction is established under the Alien Tort Claims Act, 28 U.S.C. § 1350 and the Fair Labor Standards Act, 29 U.S.C. § 201 *et. seq.*  This Court also has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because there is complete diversity between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.

This Court has supplemental jurisdiction over the related state law claims asserted herein, which form part of the same case or controversy as those claims over which the Court has original jurisdiction, pursuant to 28 U.S.C. § 1367.

9.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants resided in this district during relevant time periods and because the acts or omissions complained about occurred in this district.

* * * * *

* * * * *

* * * * *

* * * * *

* * * * *

Page 3 -    FIRST AMENDED COMPLAINT

## FACTUAL ALLEGATIONS

### (Ethiopia)

10.

Ms. Derbew is thirty-two years old.  She is the oldest of six children.  Her parents have a small, primitive farm in rural Ethiopia, which has no electricity, indoor plumbing or telephone.  The nearest village has no school, and Ms. Derbew's parents are illiterate.

11.

At age ten, Ms. Derbew was sent across the country, to the city of Addis Ababa, to live with an aunt.  For the first time, with her aunt's support, Ms. Derbew had the opportunity to attend school.  She enjoyed her studies and found that she has an affinity for languages.  She quickly learned Amharic, which is the national language of Ethiopia.  Prior to learning Amharic, Ms. Derbew spoke only Tigrinya.

12.

At age 16, Ms. Derbew began to look for ways to help pay the cost of her education and help support herself and her family.  She found work with teachers at her school, Mr. and Ms. Mathew ("the Mathews"), who had a friendship with her aunt and a need for childcare services.  Ms. Derbew moved in with the Mathews, cared for the Mathews' two children during the day, and attended school at night.  In exchange for her work, Ms. Derbew received a modest salary, part of which she used for tuition.  The remainder was sent to her impoverished family.  Ms. Derbew was delighted that her work provided a means to extend her education, which Ms. Derbew knew was an important part of building a brighter future.

13.

Ms. Derbew's time with the Mathews was a happy time.  She developed close relationships with the Mathews and their children.  The Mathews were generous people who taught Ms. Derbew about their homeland, India, and shared their customs, culture and language.

Page 4 -     FIRST AMENDED COMPLAINT

Ms. Derbew learned to communicate in Malayalam, which is one of the languages the Mathews family used from time to time.

14.

After Ms. Derbew had lived with the Mathews for approximately five years, Mr. Mathew was contacted by a distant relative, Defendant Kurian, who was living in Oregon. Defendant Kurian explained that he and his wife needed assistance with childcare and asked Mr. Mathew to help him locate a young Ethiopian woman who would be willing to move to Oregon.

15.

Mr. Mathew recommended Ms. Derbew for the job. While the Mathews were reluctant to part with Ms. Derbew, they wanted what was best for her and believed that the chance to move to the United States could lead to a better life.

16.

Mr. Mathew encouraged Ms. Derbew to accept the job with the Kurians. He explained that the chance to move to the United States was a tremendous opportunity. In particular, he emphasized that the ability to earn "American" wages would be of great value for Ms. Derbew and her family.

17.

Ms. Derbew received conflicting advice from her aunt, who cautioned Ms. Derbew about moving across the world to live with strangers. Ms. Derbew's aunt explained that it was not uncommon for Ethiopian women, who lacked the ability to protect themselves, to be taken advantage of by foreigners. She further cautioned Ms. Derbew that, even though Defendant Kurian was related to Mr. Mathew, that did not provide adequate assurance of his character. In fact, Mr. Mathew admitted that he could not vouch for Defendant Kurian's character because Mr. Mathew only knew Defendant Kurian as a small boy.

Page 5 -    FIRST AMENDED COMPLAINT

18.

The Kurians convinced Ms. Derbew to accept the job.  They sent Ms. Derbew photographs of Defendant J. Gilbert with her children, which portrayed a warm and loving environment.  In addition, the Kurians sent Ms. Derbew a written contract detailing the terms of their offer.  Because Ms. Derbew could not read the contract, which was written in English, Mr. Mathew explained its terms, which he described as very generous.  With the assurance of written promises that she would be treated well, along with the photographs depicting a loving family, Ms. Derbew was convinced to move to Oregon.

**(The Kurians)**

19.

In or about 1995, the Kurians had been married for several years.  At the time, the couple had two infant children.

20.

Because of the demands of Defendant J. Gilbert's medical career, and because Defendant Kurian's work required considerable travel, the Kurians needed full-time childcare. To find a suitable candidate for the job, Defendant Kurian contacted his uncle, George Mathew.

21.

The Kurians offered Ms. Derbew a job and made arrangements for her to obtain an H2B Visa, which allowed Ms. Derbew to enter the United States and work lawfully.

22.

In or about July 1996, the Kurians obtained an airline ticket for Ms. Derbew to travel from Ethiopia to Portland, Oregon.  Because Ms. Derbew had no experience with international travel (or even flying), and because she was intimidated by the process, Defendant Kurian met Ms. Derbew in Europe and escorted her to Salem.

* * * * *

* * * * *

Page 6 -    FIRST AMENDED COMPLAINT

23.

At the time Ms. Derbew began working for the Kurians, she could not speak, read, or write English.

**(The Employment Contract)**

24.

The Kurians and Ms. Derbew entered into a written employment contract, entitled "CONTRACT FOR EMPLOYMENT AS A CHILD CARE MONITOR" (the "Employment Contract"), in or about December 1995.

25.

The purpose of the Employment Contract was to provide the Kurians with "full care for [their] 30 month old daughter…and 13 month old son."  Her specific duties were identified:  "bathing, feeding, putting down for naps, changing diapers, playing with, taking for walks, and watching the children during the entire workday."

26.

Under the terms of the Employment Contract, Ms. Derbew was to receive $5.00 per hour regular wages, and $7.50 per hour overtime wages.  The Kurians were precluded from requiring Ms. Derbew from working over 48 hours per week.

27.

The Employment Contract set out that Ms. Derbew was to receive a private room and board at no cost.  However, she was required to repay travel expenses of $1,400 at a rate of $125.00 per month.

**(The Servitude)**

28.

The scope of work that the Kurians demanded of Ms. Derbew wholly exceeded that set forth in the Employment Contract, both in terms of the amount and type of work required.

Page 7 -    FIRST AMENDED COMPLAINT

29.

Ms. Derbew worked around the clock, seven days a week.  Her typical work day exceeded 13 hours.  Ms. Derbew's labors began when the first child awakened in the morning (usually around 7:00 a.m.), and ended when the last child fell asleep (usually around 8:00 p.m.). In addition, so that the Kurians could sleep, Ms. Derbew cared for the children during the night.

30.

Ms. Derbew did not receive time off on weekends or holidays.  To gain a few moments alone, from time to time, Ms. Derbew would skip church services with the family on Sunday.  With one exception, Ms. Derbew did not take a vacation during her nearly seven years of employment.

31.

Ms. Derbew was required to perform all housekeeping duties and gardening.  She cleaned the house from top to bottom, did the entire family's laundry, and cooked family meals.

32.

Childcare duties were not limited to two children.  In fact, Ms. Derbew was required to provide fulltime childcare for as many as four children.

33.

For over one year, Ms. Derbew did not receive a private room.  Instead, she was forced to share a room with two young children.

**(Trust, Isolation and Betrayal)**

34.

Ms. Derbew was vulnerable upon arriving in Oregon.  She had no money and knew nothing about her new environment.  Her only means of communicating with the Kurians was by speaking to Defendant Kurian in Malayalam.  Because her knowledge of that language was limited, Ms. Derbew's ability to communicate with the Kurians was limited.

35.

Ms. Derbew was forced to rely on the Kurians for all aspects of subsistence and comfort, including food, clothing, personal items and shelter.  She had no alternatives. Ms. Derbew had no friends or family in the United States, and no way of contacting her family back home.  In fact, the Kurians forbade Ms. Derbew from using the telephone to call Ethiopia, arguing that such calls were too expensive.

36.

Likewise, Ms. Derbew was forced to rely on the Kurians for all knowledge and information that she received about her new world.

37.

Ms. Derbew was physically isolated because the Kurian home was located on a sizeable parcel of property in a rural location.  She had no transportation, money or means of communicating with Oregonians.  Ms. Derbew rarely left Defendants' house unless she was accompanied by Defendants or their children.  She had no way to seek out companionship and support.

38.

Immediately upon her arrival in Oregon, the Kurians took possession of Ms. Derbew's work papers.  Defendant Kurian explained that the Kurians would monitor Ms. Derbew's immigration work status and ensure compliance with all regulations.  At the time, because the Kurians had obtained her first work permit, and because language barriers prevented her from conducting business in the United States, the plan made sense to Ms. Derbew.

39.

Ms. Derbew focused her energy on learning English, and she was a quick study. In time, Ms. Derbew was able to communicate with Defendant J. Gilbert directly.  Once that was possible, Defendant J. Gilbert took over the job of directing Ms. Derbew's work activities.

40.

As Ms. Derbew's English improved, she was able to inquire about her wages. Defendant J. Gilbert explained that, for the sake of safety and security, the Kurians had set up a bank account for Ms. Derbew and were regularly making deposits. From time to time, Defendant J. Gilbert reassured Ms. Derbew that Ms. Derbew had acquired substantial assets. Ms. Derbew did not understand representations Defendant J. Gilbert made about the amount of money earned because Ms. Derbew did not understand currency. She had never possessed money (her Ethiopian wages were sent home) and, in any event, was not familiar with United States currency.

41.

The Kurians did not establish a bank account for Ms. Derbew and make deposits into that account, as they promised. Instead, they accepted Ms. Derbew's work without payment.

42.

The Kurians did not monitor and keep current Ms. Derbew's immigration work status. Instead, they permitted her immigration work status to lapse. As a result, without her knowledge, Ms. Derbew became an illegal alien working in the United States.

**(The Divorce)**

43.

The marriage between the Kurians was not a happy one. The couple fought often and fiercely, and Ms. Derbew was frequently caught in the middle. For example, when Ms. Derbew would ask one spouse a question about her employment, she would be directed to the other spouse, who would not be pleased with Ms. Derbew as a result. In short, communications with the Kurians were difficult and ineffective.

* * * * *

* * * * *

* * * * *

Page 10 -  FIRST AMENDED COMPLAINT

44.

The Kurians separated in approximately 1998, not long after the death of one of their children, and divorced in 1999.  Defendant Kurian moved to Vancouver, Washington, but kept in frequent contact with the family.  Ms. Derbew saw Defendant Kurian on weekends when he picked up the children for visitations.

**(Remarriage)**

45.

Defendant J. Gilbert later married Defendant K. Gilbert, and he moved his family into the J. Gilbert home.  As a result, Ms. Derbew became responsible for the care of Defendant K. Gilbert's son, and for performing domestic chores arising from the additions to the household. Later, when the new marriage produced a child, Ms. Derbew was made responsible for the baby's care.

**(Mr. Gebrehiwot)**

46.

Alem Gebrehiwot is the owner of the Queen of Sheba, an Ethiopian restaurant located in northeast Portland.  Mr. Gebrehiwot is of Ethiopian descent.

47.

Before they divorced, the Kurians dined at the Queen of Sheba.  The couple sought out Mr. Gebrehiwot and asked several questions about Ethiopian cuisine.  The conversation was awkward, and it left Mr. Gebrehiwot suspicious of the couple's activities.

48.

Mr. Gebrehiwot was aware that Ethiopian women suffer unlawful servitude across the globe.  The conversation with the Kurians left Mr. Gebrehiwot wondering whether the Kurians were keeping an Ethiopian woman.  To allay his concerns, Mr. Gebrehiwot sought out members of the Ethiopian community living near Salem and asked about an Ethiopian woman working for an Indian gentleman.  Nobody knew about Ms. Derbew.

Page 11 -  FIRST AMENDED COMPLAINT

49.

Several years later, after the divorce, Defendant Kurian began to frequent the Queen of Sheba with a female friend.  Mr. Gebrehiwot would talk with them from time to time.

50.

On Ms. Derbew's birthday, December 9, 2001, Defendant Kurian's female friend took Ms. Derbew to the Queen of Sheba restaurant.  Mr. Gebrehiwot was introduced to Ms. Derbew.  He inquired about her living and working arrangements, and obtained contact information.  Mr. Gebrehiwot began to converse with Ms. Derbew by telephone during the daytime.

51.

Through his discussions with Ms. Derbew, Mr. Gebrehiwot's suspicions were confirmed.  He learned that Ms. Derbew lived in isolation and was being required to work around the clock without pay.

52.

Mr. Gebrehiwot counseled Ms. Derbew to demand the return of her work papers and payment for the services she rendered, and to sever her relationship with Defendants.  She was perplexed.  Until she met Mr. Gebrehiwot, Defendants were Ms. Derbew's only source of information about the United States and her employment.  This new information was contradictory and confusing.  In fact, Ms. Derbew realized that, if Mr. Gebrehiwot was correct about Defendants, they had been taking advantage of her for years.  She did not want to believe that.  Rather, she wanted to believe that Defendants were honest, good people.  The fact that they held themselves out to be devout Christians, who were held in high regard within their Church, gave Ms. Derbew hope that Mr. Gebrehiwot was wrong.

53.

Ms. Derbew explained Mr. Gebrehiwot's concerns to Defendants and asked about her work papers and the money that she believed had been placed in a bank account for her.  In

response, Defendants attacked her verbally.  They told Ms. Derbew that she had violated United States law by working without authorization and, as a result, would be thrown in jail should she pursue this matter further.  In addition, Defendants told Ms. Derbew that they could have her deported to Ethiopia, where she would return penniless.  Further, Defendants threatened to defame Ms. Derbew in a manner that could jeopardize her safety in Ethiopia.  Ms. Derbew became frightened and distressed.

54.

Mr. Gebrehiwot learned about Defendants' attack and decided to confront Defendants personally.  He traveled to the Gilbert home and demanded that Defendants make amends with Ms. Derbew.  Defendants became angry with Mr. Gebrehiwot and he feared that further interference by him might provoke violence by Defendants.

55.

Defendant J. Gilbert did become violent.  During a subsequent discussion with Ms. Derbew about Ms. Derbew's employment, Defendant J. Gilbert became very angry with Ms. Derbew and threw a telephone near her, smashing it into pieces.  Because of her diminutive size and precarious circumstances, Ms. Derbew concluded that she should not fight Defendants, and must submit to their control.

56.

Defendants waged psychological attacks also.  Aware of Ms. Derbew's love for their children, Defendants told Ms. Derbew that, if she pursued any action against Defendants, Defendants would be thrown in jail for failing to pay taxes.  Defendants said that their children would hate Ms. Derbew for causing their parents to be taken away and for destroying their home. In addition, Defendants verbally berated and belittled Ms. Derbew, calling her "stupid" and ordering her about.

* * * * *

* * * * *

**(Texas)**

57.

Soon after the Gebrehiwot confrontation, Defendants made arrangements for Ms. Derbew to move to Texas to live with and work for friends of the Kurians. Ms. Derbew tried to object, but Defendants attacked again. They renewed threats about jail and deportation, and made clear that Ms. Derbew had no choice but to comply with their wishes.

58.

To ensure that she followed instructions, Defendant J. Gilbert escorted Ms. Derbew to Texas. When Ms. Derbew asked to be paid all of the money owed to her, Defendant J. Gilbert gave Ms. Derbew a check for only $10,000 and ordered her to follow directions if she knew what was good for her.

59.

As their relationship developed, the Texas family inquired about Ms. Derbew's time in Oregon. Ms. Derbew explained truthfully, and the Texas family became upset. They tried to help. They contacted Defendants and urged them to do the right thing and compensate Ms. Derbew fairly.

60.

When Defendant J. Gilbert was confronted, she attacked again. Defendant J. Gilbert told her friends to mind their own business and threatened to contact the authorities in Texas if they did not. Defendant J. Gilbert explained that Ms. Debew was an illegal alien and that, should the interference continue, Defendant J. Gilbert would have Ms. Derbew arrested and deported.

61.

The Texas family was distressed about employing an illegal alien. They contacted Defendant Kurian, who agreed to help revive Ms. Derbew's immigration work status. The family told Ms. Derbew that they could not continue to employ her. However, they invited

Ms. Derbew to return once the problem with her immigration work status was resolved.  Soon thereafter, Ms. Derbew traveled to Defendant Kurian's home in Vancouver, Washington.

**(Vancouver)**

62.

Defendant Kurian did not deliver on his promises.  Instead, he continued to take advantage of Ms. Derbew.

63.

Ms. Derbew took care of Defendant Kurian's children during their visitations.  In addition, she performed household services, including house cleaning, laundry and cooking duties.  Ms. Derbew was not compensated for her work.  In fact, instead of paying Ms. Derbew for services rendered, Defendant Kurian convinced her to lend him $2,000 from the money Ms. Derbew had earned in Texas.

64.

Defendant Kurian did not help Ms. Derbew renew her immigration work status.  Instead, he blamed Defendants J. Gilbert and K. Gilbert for Ms. Derbew's circumstances and encouraged Ms. Derbew to seek recompense from them.  As a result of the threats of jail, deportation and harm, Ms. Derbew was afraid to do that again.  She felt trapped and alone.

65.

Defendant Kurian tried to take advantage of Ms. Derbew's fear and fragile mental state.  To eliminate the problem that Ms. Derbew presented in his life, Defendant Kurian searched out an acquaintance living in the Seattle area who was willing to accept services from an illegal alien.  He began to pressure Ms. Derbew to move again.

* * * * *

* * * * *

* * * * *

* * * * *

**(Rescue)**

66.

Ms. Derbew turned for help to her only friend, Mr. Gebrehiwot.  He convinced her to leave Defendant Kurian's house and, over objections rooted in fear, to meet with immigration and law enforcement officials.

67.

Ms. Derbew was interviewed by agents of the Federal Bureau of Investigation, who initiated a criminal investigation into Defendants' misconduct, which is ongoing.  The FBI agents instructed Ms. Derbew not to discuss their investigation or her circumstances with anyone and not to return to Defendant Kurian's home.

68.

As a result of her unexpected departure and the FBI's warnings, Ms. Derbew left most of her personal belongings at Defendant Kurian's home.  Among other things, she left $2,000, which Defendant Kurian has never returned.

69.

To combat her severe distress and anxiety, Ms. Derbew received psychiatric care.  She was diagnosed with post-traumatic stress disorder, major depressive order, and severe stress, among other things.  For a significant period of time, her treatment included medications.

70.

Ms. Derbew was introduced to immigration lawyers who volunteered to help her.  On or about February 1, 2005, Ms. Derbew received a T-Visa, validating her status as a victim of human trafficking.  As a result, at long last, Ms. Derbew found herself free from Defendants' threats and control.

* * * * *

* * * * *

* * * * *

Page 16 -  FIRST AMENDED COMPLAINT

**(Emotional Distress)**

71.

Ms. Derbew suffered severe emotional distress as a result of Defendants' misconduct.  Among other things, Defendants' acts caused Ms. Derbew to experience fear, paranoia, depression, humiliation, and mental anguish.  She cried often, had nightmares and lost sleep.  In addition, Ms. Derbew lost her appetite and, as a result, lost weight.

**(Suspension of Statute of Limitations)**

72.

Any statute of limitations relating to the causes of action alleged in this Complaint on behalf of Ms. Derbew has been suspended for the period of Ms. Derbew's involuntary servitude.  Ms. Derbew was unable to seek appropriate remedies, including the filing of a lawsuit, during that time.

73.

In addition, any statute of limitations relating to the causes of action alleged in this Complaint on behalf of Ms. Derbew has been suspended during the period after Ms. Derbew escaped from Defendants but during which she continued to suffer under the influence of defendants' threats and misrepresentations.  Ms. Derbew was unable to seek appropriate remedies, including the filing of a lawsuit, during that time.

**FIRST CLAIM FOR RELIEF**

**(ALIEN TORT CLAIMS ACT, 28 U.S.C. § 1350 – AS TO ALL DEFENDANTS)**

74.

Plaintiff realleges paragraphs 1 through 73 of this Complaint.

75.

Defendants obtained Ms. Derbew's labor through fraudulent statements and concealment, as well as legal, psychological and other means of coercion intended to cause

Page 17 -  FIRST AMENDED COMPLAINT

Ms. Derbew to believe that she would suffer serious harm if she did not continue to work for Defendants.

76.

Through such actions, Defendants committed the torts of involuntary servitude and forced labor in violation of treaties of the United States, which in concert with other international instruments, constitute the law of nations for purposes of the Alien Tort Claims Act, 28 U.S.C. § 1350.  The controlling law of nations includes the Universal Declaration of Human Rights; the International Covenant on Civil and Political Rights; the American Convention on Human Rights; and the International Labour Organization:  Convention Concerning Forced or Compulsory Labour.

77.

Because forced labor is so widely condemned, it is not just a violation of the law of nations, but a violation of *jus cogens* (literally "compelling law") norms.  *Jus cogens* norms, also known as peremptory norms of international law, are norms accepted and recognized by the international community of states as a whole as norms from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character.

78.

Defendants' reprehensible and tortious conduct is in violation of *jus cogens* norms and such conduct caused Ms. Derbew to suffer actual harm as set forth herein.

## SECOND CLAIM FOR RELIEF

### (BREACH OF CONTRACT – AS TO ALL DEFENDANTS)

79.

Plaintiff realleges paragraphs 1 through 78 of this Complaint.

* * * * *

* * * * *

Page 18 -  FIRST AMENDED COMPLAINT

80.

The Kurians entered into an Employment Contract with Ms. Derbew in or about December 1995, for good and valuable consideration.

81.

For nearly seven years, except for the brief period of time that Defendants forced Ms. Derbew to live in Texas, Ms. Derbew lived with and worked for Defendants.

82.

Ms. Derbew has duly satisfied all conditions precedent required on her part to be performed in accordance with the terms and conditions of the Employment Contract.

83.

Defendants breached the Employment Contract by (1) requiring Ms. Derbew to perform work exceeding the scope of work set forth in the Employment Contract, (2) requiring Ms. Derbew to work more than 48 hour per week, and (3) failing or refusing to pay Ms. Derbew for work performed.

84.

Over the course of nearly seven years of employment, Defendants paid Ms. Derbew only $12,000. Under the terms of the Employment Contract, Defendants were required to pay Ms. Derbew $5.00 per hour regular wages, and $7.50 per hour overtime wages. On this basis, Defendants should have paid Ms. Derbew approximately $164,000. Subtracting out monies paid and travel costs, Defendants failed to pay Ms. Derbew approximately $150,600.

85.

As a result of Defendants' breaches of contract, Ms. Derbew has suffered damages in an amount of not less than $150,600. Ms. Derbew is entitled to prejudgment interest at the statutory rate of nine percent per annum.

* * * * *

* * * * *

## THIRD CLAIM FOR RELIEF

## (PROMISSORY ESTOPPEL – AS TO THE KURIANS)

86.

Plaintiff realleges paragraphs 1 through 85 of this Complaint.

87.

The Kurians promised Ms. Derbew that if she moved to the United States and worked as a childcare provider for their children, they would fairly compensate her for her services.

88.

The Kurians could foresee that Ms. Derbew would rely on their promises and, in fact, intended that Ms. Derbew would rely on their promises.

89.

Ms. Derbew did in fact reasonably rely on the Kurians' promises.

90.

As a result of her reliance, Ms. Derbew left her home in Ethiopia, moved to the United States to live with an unknown family, and provided nearly seven years of service as a full time childcare provider and domestic worker.  The reasonable value of the services rendered is $193,600.

91.

Ms. Derbew is entitled to an award of damages of not less than $193,600.

## FOURTH CLAIM FOR RELIEF

## (QUANTUM MERUIT - AS TO ALL DEFENDANTS)

92.

Plaintiff realleges paragraphs 1 through 91 of this Complaint.

* * * * *

* * * * *

Page 20 -  FIRST AMENDED COMPLAINT

93.

At Defendants' request, Ms. Derbew provided Defendants with nearly seven years of full time childcare and domestic services.

94.

Defendants were aware of these services and were aware that Ms. Derbew reasonably expected to be paid for those services.

95.

Under the circumstances, it would be unjust to allow Defendants to retain the benefit of Ms. Derbew's services without requiring them to pay for those services. Accordingly, Defendants are liable to Ms. Derbew for the reasonable value of the services she provided at Defendants' request. The reasonable value of the services rendered is approximately $193,600.

## FIFTH CLAIM FOR RELIEF

## (FRAUD - AS TO THE KURIANS)

96.

Plaintiff realleges paragraphs 1 through 95 of this Complaint.

97.

Defendants knowingly made false representations to Ms. Derbew prior to and throughout her term of employment about the circumstances of her emigration to the United States, including, but not limited to falsely informing Ms. Derbew:

(a) that she would be paid properly in accordance with the laws of the United States;

(b) that her money was being placed in a bank account, on her behalf;

(c) that she would only be responsible for caring for two children;

(d) that she would work a maximum of five days per week;

(e) that she would work a maximum of 48 hours per week;

(f) that she would be deported or jailed if she complained about her treatment;

(g)  that she would be deported or jailed if she complained about not being paid;

(h)  that the Kurians were responsible for properly renewing Ms. Derbew's immigration work status and had carried out or would carry out such renewals; and

(i)  that if she pursued any action against Defendants, Defendants would be thrown in jail for failing to pay taxes, causing Defendants' children to hate Ms. Derbew for destroying their home.

98.

Defendants had knowledge of the falsity of their representations at the time those representations were made.

99.

Defendants intended for Ms. Derbew to rely on their false representations.

100.

Ms. Derbew justifiably relied on Defendants' false representations in deciding to leave her home, emigrate to the United States, and endure the situation in which she found herself.  Given Defendants' role as Ms. Derbew's employers and fiduciaries, Ms. Derbew reasonably relied on their representations as to what her job responsibilities would be.  She also reasonably relied on Defendants' representations about the risks of deportation and jail.  She spoke very little English, had limited education, had no independent knowledge of the immigration or legal system in the United states, and had no means with which to challenge or confirm their representations.

101.

Ms. Derbew was harmed as a result of her reliance on Defendant' false representations, which caused her to leave her home in Ethiopia, subjected her to exploitation of her labor, and caused her to suffer emotional injuries and physical manifestation of her emotional injuries.

* * * * *

102.

Ms. Derbew suffered economic and non-economic injuries as a result of Defendants' misconduct and is entitled to damages in an amount to be proven at trial.

103.

Defendants acted with the wrongful intention of injuring Ms. Derbew or recklessly, with an improper motive amounting to malice, in conscious disregard of Ms. Derbew's rights.

104.

Because Defendants' actions were willful, wanton, malicious, and oppressive, Ms. Derbew is also entitled to an award of punitive damages in an amount to be proved at trial.

## SIXTH CLAIM FOR RELIEF

## (FAIR LABOR STANDARDS ACT, 29 U.S.C. § 206 - AS TO ALL DEFENDANTS)

105.

Plaintiff realleges paragraphs 1 through 104 of this Complaint.

106.

The Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206, provides that an employee employed in domestic service in a household shall be paid the minimum wage as required by law.  At all relevant times, Ms. Derbew was employed in domestic services in one or more of Defendants' households and was so employed for more than eight hours in the aggregate every week.  Domestic service employees who live in the household where they are employed are entitled under the FLSA to be paid the minimum wage for all hours worked pursuant to 29 C.F.R. § 552.102.

107.

Ms. Derbew provided services on a daily and weekly basis for all of the Defendants, so that at all relevant times each of the Defendants was a single employer or joint

* * * * *

Page 23 -   FIRST AMENDED COMPLAINT

employer of Ms. Derbew within the meaning of the FLSA, 29 U.S.C. § 203(d).  Defendants never paid Ms. Derbew the minimum wage for the services that she provided to them.

108.

Ms. Derbew, a non-exempt employee, performed work for some or all of the individual Defendants at all times alleged herein.

109.

Defendants knowingly and willfully required, or permitted Ms. Derbew to work hours well beyond a normal work day and knowingly and willfully refused to pay Ms. Derbew the minimum wage for hours worked as required under federal law.

110.

Defendants often required Ms. Derbew to be on-call 24 hours a day.  During many nights, Defendants' children interrupted Ms. Derbew's sleep and Defendants required that she wake up and take care of them, denying Ms. Derbew a reasonable night's sleep.

111.

Defendants have specific employment record-keeping obligations under the FLSA, 29 U.S.C. § 211(c), including making, keeping, and preserving records of their employees and the wages, hours, and other conditions and practices of employment maintained by Defendants.  Defendants are obligated to accurately record the actual number of hours that each employee works.  Upon information and belief, Defendants failed to keep such records.

112.

Defendants knew, should have known, or showed reckless disregard for the FLSA's provisions applicable to Ms. Derbew and willfully, intentionally, and without good faith violated these laws.  As a result of Defendants' willful violations, Ms. Derbew is entitled to receive liquidated damages in an additional equal amount above the wages already due her.

* * * * *

* * * * *

Page 24 -  FIRST AMENDED COMPLAINT

113.

Under the FLSA, 29 U.S.C. § 216(b), Ms. Derbew is entitled to recover all unpaid wages, an additional equal amount as liquidated damages, reasonable attorney fees and costs in amounts to be proven at trial, and interest at the statutory rate of nine percent per annum.

## SEVENTH CLAIM FOR RELIEF

## (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS –

## AS TO ALL DEFENDANTS)

114.

Plaintiff realleges paragraphs 1 through 113 of this Complaint.

115.

Ms. Derbew and Defendants were involved in a special relationship. Defendants caused Ms. Derbew to travel from Ethiopia to the United States with knowledge of Ms. Derbew's vulnerability, lack of English language skills, and dependence upon Defendants as her caregivers. In addition, Defendants took responsibility for Ms. Derbew's finances and her immigration work status.

116.

Defendants engaged in extreme and outrageous conduct as set forth herein.

117.

Defendants knowingly, deliberately, and intentionally committed the acts alleged in this Complaint against Ms. Derbew and/or recklessly disregarded the probability of causing Ms. Derbew emotional distress.

118.

Defendants' acts were an extraordinary transgression of the bounds of socially tolerable conduct. Defendants' acts caused Ms. Derbew to suffer fear, depression, humiliation, paranoia and mental anguish, as well as resulting nightmares, sleeplessness, a loss of appetite and weight loss, which directly and proximately caused injuries to Ms. Derbew.

119.

Defendants committed the acts alleged in this Complaint with the wrongful intention of injuring Ms. Derbew and with an improper motive amounting to malice, in conscious disregard of Ms. Derbew's rights.  Because Defendants' actions were willful, wanton, malicious and oppressive, Ms. Derbew is also entitled to an award of punitive damages in an amount to be proved at trial.

**EIGHTH CLAIM FOR RELIEF**

**(BREACH OF FIDUCIARY DUTY - AS TO ALL DEFENDANTS)**

120.

Plaintiff realleges paragraphs 1 through 119 of this Complaint.

121.

Defendants held a position of trust as to Ms. Derbew.  They employed Ms. Derbew and were responsible for:

(a)  her decision to move to the United States;

(b)  making sure she had a house to live in and food to eat;

(c)  her money, which was supposedly in a bank account opened and controlled by the Kurians;

(d)  her contact with the outside world, given her inability to speak fluent English;

(e)  physical possession of her Visa and working papers; and

(f)  renewing her immigration work status.

Accordingly, a special relationship existed between Defendants and Ms. Derbew.

122.

Defendants owed Ms. Derbew fiduciary duties, including the duties of care, honesty, candor, and disclosure.

* * * * *

* * * * *

Page 26 -  FIRST AMENDED COMPLAINT

123.

Defendants breached their fiduciary duties by failing to pay Ms. Derbew the fair compensation owed to her and causing Ms. Derbew to live in fear of being deported or jailed.

124.

Ms. Derbew is entitled to recover from Defendants, for their breach of their fiduciary duties, the fair value of childcare and domestic services provided. Ms. Derbew is also entitled to non-economic and punitive damages caused by Defendants' malicious, willful and wanton actions, which were so reckless as to imply a disregard for societal obligations.

## NINTH CLAIM FOR RELIEF

## (CONVERSION – AS TO THE KURIANS)

125.

Plaintiff realleges paragraphs 1 through 124 of this Complaint.

126.

Ms. Derbew owned travel and Visa documents, and a copy of the Employment Contract that the Kurians intentionally took from her upon her arrival in the United States.

127.

Ms. Derbew earned, but did not possess, money for the services she provided to Defendants. The Kurians told Ms. Derbew that they opened a bank account on her behalf and were regularly depositing her salary into that account. To the extent such an account existed, the Kurians had complete control over and access to the account. Ms. Derbew had no authority or knowledge of how to access the funds in the account.

128.

Ms. Derbew owned $2,000 in cash, which she left at Defendant Kurian's house, when she escaped. Defendant Kurian has never returned that money to Ms. Derbew.

* * * * *

* * * * *

Page 27 -  FIRST AMENDED COMPLAINT

129.

Defendants never returned Ms. Derbew's documents to her and never released her salary to her from the bank account.  Defendant Kurian never returned Ms. Derbew's $2,000 to her.

130.

As a result of Defendants' wrongful acts and omissions, Ms. Derbew has been injured and demands restitution and damages in an amount to be determined at trial.

131.

Defendants committed the acts alleged in this Complaint with the wrongful intention of injuring Ms. Derbew with an improper motive amounting to malice, in conscious disregard of Ms. Derbew's rights.  Because Defendants' actions were willful, wanton, malicious, and oppressive, Ms. Derbew is also entitled to an award of punitive damages in an amount to be proved at trial.

## TENTH CLAIM FOR RELIEF

## (BREACH OF CONTRACT – AS TO DEFENDANT KURIAN)

132.

Plaintiff realleges paragraphs 1 through 131 of this Complaint.

133.

On or about September 4, 2003, Ms. Derbew loaned Defendant Kurian $2,000. On that same date, Defendant Kurian executed and delivered to Ms. Derbew a promissory note in the principal sum of $2,000.

134.

Pursuant to the terms of the promissory note, Defendant Kurian was to "pay the amount back in 3 months" to Ms. Derbew.

* * * * *

* * * * *

Page 28 -  FIRST AMENDED COMPLAINT

135.

Defendant has breached the promissory note by failing or refusing to pay any amount due under the promissory note.

136.

Ms. Derbew has performed all of conditions precedent to Defendant Kurian's performance.

137.

Ms. Derbew is entitled to recover $2,000 from Defendant Kurian, plus interest on that amount at the statutory rate of nine percent, beginning as of December 4, 2003.

**JURY TRIAL DEMAND**

Ms. Derbew demands a jury trial.

WHEREFORE, Ms. Derbew demands judgment as follows:

1. Compensatory and special damages in an amount to be proven at trial of not less than $154,600;

2. Unpaid wages, including minimum wages and overtime premiums, in an amount to be proven at trial of not less than $156,920;

3. Statutory penalties and liquidated damages according to proof at the time of trial, of not less than $156,920;

4. Non-economic damages in an amount to be proved at trial of not less than $400,000;

5. Punitive and exemplary damages in an amount according to proof at the time of trial of not less than $250,000;

6. Pre- and post-judgment interest;

7. Reasonable attorney fees, costs, and disbursements; and

8.   Such other and further relief as the Court deems just and equitable.

DATED this 2nd day of January 2007.

TONKON TORP LLP


By s/ Steven D. Olson
    Steven D. Olson, OSB No. 00341
    Ava L. Schoen, OSB No. 04407

    Attorneys for Plaintiff Mulu Derbew

CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **FIRST AMENDED COMPLAINT**

on:

Mr. Miles Sweeney
Brownstein, Rask, Arenz, Sweeney, Kerr & Grim
1200 S.W. Main Street
Portland, OR  97204-3730

Attorney for Defendant Peter Kurian

Mr. Peter H. Glade
Markowitz Herbold Glade & Mehlhaf, P.C.
Suite 3000
1211 S.W. Fifth Avenue
Portland, OR  97205

Attorney for Defendants Julie Gilbert and Kenneth Gilbert

☒ by electronic means through the Court's transmission facilities pursuant to

FRCP 5(b)(2)(D);

☐ by mailing a copy thereof in a sealed, first-class postage prepaid envelope,

addressed to each attorney's last-known address and depositing in the U.S. mail at Portland,

Oregon on the date set forth below;

☐ by causing a copy thereof to be hand-delivered to said attorneys at each

attorney's last-known office address on the date set forth below;

☐ by sending a copy thereof via overnight courier in a sealed, prepaid envelope,

addressed to each attorney's last-known address on the date set forth below; or

☐ by faxing a copy thereof to each attorney's last-known facsimile number on the date set forth below.

DATED this 2nd day of January, 2007.

TONKON TORP LLP

By s/ Steven D. Olson
_____
Steven D. Olson, OSB No. 00341
Ava L. Schoen, OSB No. 04407

Attorneys for Plaintiff Mulu Derbew

033539\00001\732998 V001

Page 2 -    CERTIFICATE OF SERVICE